**Paul S. Bovarnick,** OSB #79165
pbovarnick@rsblaw.net
**ROSE SENDERS & BOVARNICK, LLP**
1205 NW 25th Avenue
Portland, OR 97210
(503) 227-2486
Fax: (503) 226-3131

**Eric D. Holland**
eholland@allfela.com
**Steven J. Stolze**
sstolze@allfela.com
**R. Seth Crompton**
scrompton@allfela.com
**HOLLAND, GROVES, SCHNELLER & STOLZE, LLC**
300 N. Tucker, Suite 801
St. Louis, MO 63101
(314) 241-8111
Fax: (314) 241-5554
        (Pro Hac Vice pending)

Attorneys for Plaintiff
RB Rubber Products, Inc.

*filed*
RECVD 11 MAR 15 10:49 USDC-ORP

# UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON
## PORTLAND DIVISION

|  |  |
|---|---|
| **RB RUBBER PRODUCTS, INC.,**<br>**an Oregon Corporation** | Case No: **CV 11 - 319   AC** |
| **Plaintiff,** | **COMPLAINT**<br>**VIOLATION OF FEDERAL**<br>      **ANTITRUST LAWS** |
| v. | **DECLARATORY JUDGMENT**<br>**FALSE PATENT MARKING** |
| **ECORE INTERNATIONAL, INC.,**<br>**F/K/A DODGE-REGUPOL, INC.,** | **VIOLATION OF LANHAM ACT** |
| **Defendants.** | **DEMAND FOR JURY TRIAL** |

Plaintiff RB Rubber Products, Inc. ("RB Rubber") for its Complaint against Defendant

**Page 1 - Complaint**

ECORE International, Inc. f/k/a Dodge-Regupol, Inc. ("ECORE") alleges as follows:

## JURISDICTION AND VENUE

1. RB Rubber asserts a claim under the United States Patent Act and the Sherman Antitrust Act and seeks damages and injunctive remedies under the Clayton Act. This Court has federal subject matter jurisdiction of this action under 28 U.S.C. §§ 1331, 1337(a), and 1338(a) because this is a civil action arising under Section 2 of the Sherman Act, 15 U.S.C. § 2, Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15, 22, Sections 39 and 43(a) of the Lanham Act, and the Patent Act, Title 35 of the United States Code.

2. This Court has supplemental jurisdiction of state law claims alleged herein under 28 U.S.C. § 1367.

3. Venue is proper under 28 U.S.C. §§ 1391 and 1395(a) because a substantial part of the events or omissions giving rise to the claim occurred in this District, as more fully set forth below.

4. Venue is proper in that RB Rubber is headquartered in this District, the damages sustained by RB Rubber occurred in this District, market calculations would be done in this District, relevant witnesses with respect to damages and the acts of ECORE as it relates to harm suffered by RB Rubber would be located in this District, the cease and desist letter was sent by ECORE to RB Rubber's headquarters in this District (see paragraph 67), RB Rubber was previously served by ECORE in the Pennsylvania RB Rubber action (see paragraph 10) in this District, and upon information and belief, ECORE's products are offered for sale and sold in this District.

//

**Page 2 - Complaint**

## THE PARTIES

5. RB Rubber is a corporation duly organized and existing under the laws of the State of Oregon, and has its principal place of business in McMinnville, Oregon.

6. Defendant ECORE is a corporation duly organized and existing under the laws of the State of Pennsylvania, and has its principal place of business in Lancaster, Pennsylvania. Prior to November 2007, ECORE was known as Dodge-Regupol, Inc. and allegations herein pertain to both ECORE and Dodge-Regupol, Inc. unless otherwise indicated.(collectively referred to hereinafter as "ECORE" unless otherwise indicated).

## ALLEGATIONS COMMON TO ALL COUNTS

7. This is an action that concerns the market for acoustical underlayment flooring and ECORE's wrongful enforcement of the 6,723 Patent to dominate the market. A true and correct copy of the '723 Patent is attached as Exhibit "A".

8. As further alleged below, ECORE obtained the '723 Patent by fraud on the United States Patent and Trademark Office ("Patent Office") and by fraudulent concealment of prior art.

9. Through its enforcement of the fraudulently procured patent against RB Rubber and other competitors, ECORE hindered and delayed RB Rubber and its competitors from competing in the market for acoustical underlayment and rubber acoustical underlayment.

10. ECORE's wrongful enforcement efforts include bringing an action in January, 2006 for infringement of the '723 Patent against RB Rubber in the United States District Court for the Middle District of Pennsylvania, Case No. 3:06-CV-0236 ("Pennsylvania RB Rubber action").

11. In November, 2006, ECORE also wrongfully attempted to enforce the '723 Patent by bringing an action for infringement of the '723 Patent against another competitor, Primary

Page 3 - Complaint

Acoustics, LLC, ("Primary Acoustics"), in the United States District Court for the Eastern District of Pennsylvania, Case No. 2:06-CV-05074 ("the Primary Acoustics action"), which was ultimately voluntarily dismissed.

12. ECORE also wrongfully enforced the '723 Patent by cease and desist letters to various other competitors and distributors, including but not limited to US Rubber Recycling, Inc. ("US Rubber"), Primary Acoustics, and Kinetics Noise Control, Inc. ("Kinetics"), as well as a letter to Dinoflex Group LP, Kinetics' sole supplier of rubber acoustical underlayment in the United States during the relevant time period.

13. When discovery in the Pennsylvania RB Rubber action revealed that ECORE intentionally failed to disclose material prior art, including prior art flooring systems that were offered and sold by ECORE's predecessor and its own joint venture partner, BSW, ECORE voluntarily dismissed the Pennsylvania RB Rubber action in November, 2008.

14. Despite the discovery suggesting inequitable conduct and dismissal of the Pennsylvania RB Rubber action, ECORE has continued its attempt to enforce the fraudulently procured '723 Patent and to threaten RB Rubber, its competitors, distributors, and customers from offering to sell, selling, or purchasing competitive acoustical underlayment products and competing in the market for those products.

15. By its anti-competitive conduct, ECORE has attempted to, and did, monopolize a rapidly expanding market for acoustical underlayment and rubber acoustical underlayment.

16. As a consequence of ECORE's anti-competitive and illegal conduct, RB Rubber has sustained loss profits and other damages, and consumers in the Relevant Market were injured as further described herein.

**Page 4 - Complaint**

### Industry Background

17.    Acoustical underlayment is a flat, resilient substrate used under floor finishes to dampen sound. Underlayment products are made using a variety of materials including cork, foam, rubber, and combinations thereof.

18. Rubber acoustical underlayment is made from recycled automobile, bus, and truck tires that are turned into crumb rubber and recombined into a log that is sliced into rolled underlayment.

19. Compared to underlayment made of other materials, rubber acoustical underlayment provides the greatest sound dampening characteristics and points for LEED certification. Rubber acoustical underlayment also is known for durability and compatibility with all floor finishes including hard surface flooring often used in high rise buildings and condominiums.

20. In the past decade, there has been significant movement in the building industry to build or renovate commercial construction and high rise buildings with sustainable materials that comply with green building standards.

21. In the United States and in a number of other countries around the world, LEED certification has become the recognized standard for measuring environmentally sustainable construction.

22. In addition to environmental benefits, obtaining LEED certification allows participants to take advantage of unprecedented levels of government initiatives available for green projects and to market buildings as premier projects with increased potential for profitability. These factors, as well as heightened awareness and demand for green construction and improvements in sustainable materials have contributed to rapid growth of the green building

market.

23. According to the United States Green Building Council, since its inception in 1998, LEED certified projects have grown to encompass more than 14,000 projects in the United States and 30 countries covering 1.062 billion square feet of development area.

24. Also, according to the United States Green Building Council, the overall green building market is likely to more than double from today's $36-49 billion to $96-140 billion by 2013.

25. As a result of the significant demand for sustainable construction, the market for acoustical flooring underlayment made of recycled materials such as recycled tires has rapidly expanded.

26. By its wrongful enforcement of the fraudulently procured '723 Patent, ECORE has almost exclusively enjoyed this increased demand for rubber acoustical underlayment, at the expense of RB Rubber, its competitors, and the consumers in the industry.

### Relevant Market

27. The relevant product markets are (1) acoustical underlayment used for flooring, including but not limited to acoustical underlayment primarily made from rubber, as well as acoustical underlayment made from other materials, and (2) alternatively, acoustical underlayment made primarily from recycled tires (collectively, "Relevant Market").

28. The geographical market for the Relevant Market is the United States.

29. ECORE's anticompetitive conduct has adversely impacted competition and consumers in the Relevant Market.

### Market Power

**Page 6 - Complaint**

30. At all relevant times, RB Rubber has manufactured and sold in commerce in the United States a variety of flooring products, including rubber acoustical underlayment products called RB Silent-Tread.

31. At all relevant times, ECORE has manufactured and/or sold in commerce in the United States acoustical underlayment products, including a product called Regupol-QT or QTscu.

32. RB Rubber alleges upon information and belief that ECORE maintains the predominant market share of and market power in the Relevant Market. In fact, ECORE describes itself as North America's largest user of scrap tire rubber, recycling 80 million pounds of tire rubber each year, and claims that at least 60 million square feet of its rubber underlayment has been used in developments and buildings.

33. ECORE's sales of acoustical underlayment products approximately doubled between 2005 and 2006.

34. By its conduct of enforcing the fraudulently procured '723 Patent, ECORE has attempted to, and did, monopolize the Relevant Market.

### ECORE's Fraudulent Procurement of the '723 Patent

35. RB Rubber is informed and believes and on that basis alleges that in or about 1989, Dodge-Regupol, Inc., the predecessor to ECORE, was formed as a joint venture between the Dodge Cork Company, a Pennsylvania Company and Berleburger Schaumstoffwerk GmbH ("BSW"), a German Company.

36. On August 16, 2001, the application that resulted in the '723 Patent was filed, listing Dodge-Regupol, Inc., as the Assignee and Paul Charles Downey as the sole inventor. On July

Page 7 - Complaint

26, 2005, the '723 Patent issued.

37. RB Rubber is informed and believes and on that basis alleges that Arthur B. Dodge III was the President of Dodge-Regupol, Inc. and a member of its Board of Directors during the prosecution of the '723 Patent application. RB Rubber is informed and believes and on that basis alleges that Mr. Dodge currently serves as the President, CEO, and Chairman of the Board of ECORE. At all relevant times, Mr. Dodge was involved in the prosecution and enforcement of the '723 Patent.

38. RB Rubber is informed and believes and on that basis alleges that Mr. Downey, the named inventor of the '723 Patent, was employed by Dodge-Regupol, Inc. as its Director of Business Development and that Mr. Downey developed the '723 Patent at Mr. Dodge's direction. RB Rubber is informed and believes and on that basis alleges that Mr. Downey is currently employed as Business Development Manager of ECORE.

39. During the application process for the '723 Patent and subsequently thereafter, Dodge-Regupol, Inc., Mr. Downey, and Mr. Dodge ("Dodge Representatives") intentionally misrepresented to the Patent Office that Mr. Downey was the sole and first inventor of the invention claimed in the '723 Patent. In fact, each knew that Mr. Downey was not the sole inventor or the first inventor and that the '723 Patent was invalid and/or unenforceable on that basis.

40. During the application process for the '723 Patent and subsequently thereafter, Dodge Representatives intentionally failed to disclose to the Patent Office material prior art of which they were aware. In doing so, they violated their statutory duties of candor and good faith to the Patent Office.

**Page 8 - Complaint**

**Prior Art Intentionally Withheld From the Patent Office**

41. The purported innovation of the '723 Patent is that it provides a substrate that "minimizes the height required" while at the same time providing "insulating material which has the acoustic properties and the strength characteristics required to be used in a flooring system." Specifically, the patent claims any flooring system that has a rubber substrate with a decorative top layer and bottom surface, where the substrate has a thickness of "about 10 mm" and "voids which extend between the top surface and the bottom surface." The substrate further has sufficient "strength characteristics to support the decorative layer and prevent damage thereto and the sound dampening characteristics to provide decibel reduction through the substrate."

42. In connection with the 1989 join venture between BSW and Dodge-Regupol, BSW transferred certain information and know-how to Dodge-Regupol, including the technology and machinery for forming acoustical underlayment sheets from used tires and the feasibility of using recycled rubber sheets in a flooring system as an underlayment to reduce sound. Products made through this process were known by the brand REGUPOL.

43. The '723 Patent was based on this preexisting REGUPOL process, information and know-how that Dodge-Regupol, Inc. obtained from BSW, including a pre-existing BSW underlayment sample that Mr. Downey admitted to securing from BSW's or Dodge-Regupol's sample room.

44. Prior to August, 2000, processes that are prior art to the '723 Patent were widely used to manufacture prior art products that were advertised, used, offered for sale, or sold in the United States and abroad. During all relevant times of prosecution of the '723 Patent, Dodge Representatives were aware of these prior art processes and products but intentionally failed to

Page 9 - Complaint

disclose them to the Patent Office prior to the issuance of the Patent.

45. Prior art products and processes used, advertised, and sold in the United States prior to August 2000 include Dodge-Regupol, Inc.'s own line of products including "Everlast" and "ECOshock". The ECOshock Brochure that was produced in connection with the Pennsylvania RB Rubber action bears a copyright notice of 1999 by Dodge-Regupol, Inc. and describes products made from the prior art REGUPOL process.

46. Other prior art products used, advertised, offered for sale, and sold in the United States prior to August 2000 include flooring and underlayment product using the REGUPOL formulation called "Pulastic" and "ElastiPlus" and recycled rubber underlayment for use with Astroturf.

47. Prior art products and processes used, advertised, offered for sale, and sold in Europe prior to August, 2000 include those reflected in the following BSW brochures: (1) "Trittschalldaemmung Brochure", (2) "Ultimate Choice Brochure", and (3) the "Impact Sound Brochure". These brochures describe the sound dampening qualities of the REGUPOL recycled rubber sheet product, as well as the voids that are present in the REGUPOL product.

48. Despite the facts that Dodge Representatives were in possession of and aware of the above-referenced prior art publications, processes, and products, Dodge Representatives failed to disclose these prior art references or the REGUPOL process or products on which the '723 Patent was based to the Patent Office during the prosecution of the '723 Patent.

49. The '723 Patent as issued contains two independent claims, Claims 1 and 8, which generally relate to a flooring system having several layers (Claim 1) and a substrate with particular characteristics for use in a flooring system (Claim 8).

**Page 10 - Complaint**

50. The specification of the '723 Patent contains no mention of the REGUPOL product, the process by which REGUPOL products were made, or the prior art publications detailed above.

51. The '723 Patent also contains dependent Claims 2-7, which depend from Claim 1, and dependent Claims 9-16, which depend from Claim 8.

52. The Claims as originally submitted were rejected by the examiner. The rejection was made final following an attempt by Dodge-Regupol, Inc.'s patent counsel to argue around the cited prior art with thickness 2-12 inches.

53. Following the final rejection, Dodge-Regupol, Inc. Amended Claims 1 and 8 to include a limitation that the substrate have a thickness of "about 10 mm".

54. In adding the limitation of a substrate having a thickness of "about 10 mm", Dodge-Regupol, Inc. argued that the prior art did not teach a substrate of this thickness that also possesses the requisite voids. In particular, the applicant explained: "It is well known in the art that a substrate can not have voids and be pressed to a thickness of about 10 mm or smaller without destroying the structural integrity of the finished product. Because the claimed invention is five times thinner than the structure of the prior art and has voids, the claimed invention exhibits structural characteristics that are not taught by the prior art."

55. Dodge Representatives made this representation fraudulently and with the intent to deceive the Patent Office at the time the representation was made. In particular, Dodge Representatives intentionally failed to disclose the prior art that they were aware of that taught a substrate for use in a flooring system: (1) having a thickness of about 10 mm; (2) with voids between the top and bottom surfaces; (3) with strength characteristics to support layers above it

Page 11 - Complaint

and prevent deformation; and (4) sound dampening characteristics to provide decibel reduction.

56. These characteristics were present in prior art references that were known but intentionally withheld by the Dodge Representatives including, but limited to, its joint venture partner's prior art REGUPOL product and process as reflected in the Trittschalldaemmung Brochure, Ultimate Choice Brochure, Impact Sound Brochure, ECOshock Brochure, Pulastic product, and ElastiPlus product.

57. The withheld information was material to the Patent Office in determining whether to grant the Patent under 35 U.S.C. §§ 102, 103 because, among other things, it showed that the claimed invention was sold in the United States and described in printed publications more than one year prior to the application for a patent and it was not cumulative.

58. The prior art withheld from the examiner is not cumulative at least for the following reasons: (1) the prior art Mushunkashey and Ducharme references disclosed by the applicant did not teach voids positioned throughout the substrate so as to provide sound dampening characteristics; and (2) the prior art Kakimoto reference disclosed by the applicant contained "powdery" layers and did not have sufficient strength to support other layers. The withheld prior art references cited above teach each of these characteristics.

59. For example, the REGUPOL product and brochures embody or teach a thin ("about 10 mm") rubber sheet with voids throughout the substrate giving the substrate specific sound dampening qualities.

60. In addition, the REGUPOL product and the brochures embody or teach a thin ("about 10 mm") rubber sheet with sufficient structural strength to support an upper (decorative) layer without deformation.

**Page 12 - Complaint**

61. Had Dodge Representatives disclosed such known information regarding the prior art, the examiner would not have allowed claims that were anticipated or made obvious by the multitude of prior art products and publications.

62. Dodge Representatives withheld these references with the intent to defraud or mislead the patent examiner. The intent to defraud or mislead is underscored by both the sheer volume of withheld references, as well as the source of the references. The withheld references were either products produced by Dodge-Regupol, Inc. and/or Dodge-Regupol's joint venture partner BSW, as in the case of REGUPOL product and brochures, or was given to Dodge-Regupol, Inc. by BSW or third parties.

63. As a result of the intentional and fraudulent conduct by Dodge Representatives, the '723 Patent was issued and assigned to Dodge-Regupol, Inc.

64. In or about November, 2007, Dodge-Regupol, Inc. concluded its venture with BSW and changed its name to ECORE, retaining all brands and operations of Dodge-Regupol, Inc.

65. In connection with the name change, in or about November 7, 2007, Dodge-Regupol, Inc. assigned the '723 Patent to ECORE.

66. At all relevant times, ECORE (by and through, without limitation, the knowledge of Mr. Downey and Mr. Dodge) was aware of the fraudulent procurement of the '723 Patent but has nonetheless continued its efforts to enforce the fraudulently procured '723 Patent to monopolize the Relevant Market.

**ECORE's Wrongful Enforcement of the '723 Patent to Obtain a Monopoly**

67. ECORE wrongfully enforced the '723 Patent by a cease and desist letter to RB Rubber dated April 24, 2003.

Page 13 – Complaint

68. ECORE's wrongful enforcement efforts include bringing an action in January, 2006 for infringement of the '723 Patent against RB Rubber in the United States District Court for the Middle District of Pennsylvania, Case No. 3:06-CV-0236, which was ultimately voluntarily dismissed.

69. In November, 2006, ECORE also wrongfully attempted to enforce the '723 Patent by bringing an action for infringement of the '723 Patent against another competitor, Primary Acoustics, LLC, ("Primary Acoustics"), in the United States District Court for the Eastern District of Pennsylvania, Case No. 2:06-CV-05074, which was ultimately voluntarily dismissed.

70. ECORE also wrongfully enforced the '723 Patent by cease and desist letters to various other competitors and distributors, including but not limited to US Rubber Recycling, Inc. ("US Rubber"), Primary Acoustics, and Kinetics Noise Control, Inc. ("Kinetics"), as well as a letter to Dinoflex Group LP, Kinetics' sole supplier of rubber acoustical underlayment in the United States during the relevant time period.

71. RB Rubber is informed and believes and on that basis alleges that from at least 2006 through 2009, communications were made to competitors, distributors, architects, and end-users that they may not sell or purchase rubber acoustical underlayment products from anyone but ECORE due to the '723 Patent.

72. ECORE's threats of litigation were objectively baseless and made in bad faith because the '723 Patent was procured fraudulently through intentional misrepresentations and omissions to the patent examiner during prosecution of the '723 Patent application.

73. As a result of ECORE's anticompetitive conduct in enforcing the fraudulently procured '723 Patent, RB Rubber has lost, and continues to lose, sales of its acoustical

Page 14 - Complaint

underlayment products and has been hindered and delayed in competing in the Relevant Market.

74.  ECORE's antitrust activities has caused adverse impact on the Relevant Market including but not limited to less competition and higher prices in the Relevant Market.

### FIRST CLAIM FOR RELIEF

### (Violation of Section 2 of the Sherman Act, 15 U.S.C. Section 2)

75.  RB Rubber repeats and realleges every allegation set forth above.

76.  ECORE intentionally and fraudulently failed to disclose and concealed prior art from the Patent Office that was material to the '723 Patent application, as more fully set forth above.

77.  ECORE also intentionally misrepresented to the Patent Office that Mr. Downey was the sole and first inventor of the invention claimed in the '723 Patent when ECORE, Mr. Downey, and Mr. Dodge knew that Mr. Downey was not and that the '723 Patent was invalid and/or unenforceable on that basis.

78.  As described above, ECORE has been, and is currently engaged in, enforcing the fraudulently procured '723 Patent against its competitors, distributors, and others in the Relevant Market.

79.  Had the Patent Office learned of the prior art, it would not have issued the '723 Patent.

80.  ECORE's scheme to fraudulently induce the PTO into issuing the '723 Patent was specifically intended to support ECORE's attempt to monopolize the Relevant Market.

81.  ECORE's scheme to enforce the fraudulently procured '723 Patent was specifically intended to support ECORE's attempt to monopolize the Relevant Market.

82.  As a result of ECORE's improper attempts to maintain and enlarge its market power

through enforcement of the fraudulently procured '723 Patent, RB Rubber's attempts to compete in the market were hindered and delayed, resulting in damages including but not limited to lost profits, loss of good will, and reputation.

83. RB Rubber is entitled to recovery of damages, injunctive relief, treble damages, as well as costs of this suit and attorneys' fees, according to the Clayton Act (15 U.S.C. §§ 15, 26).

WHEREFORE, RB Rubber prays for judgment in its favor and against Defendant ECORE as follows:

That RB Rubber be awarded damages in the form of lost profit, loss of good will and reputation, as well as other damages authorized by law, treble damages, and costs and attorneys' fees in connection with this case with this action against ECORE, according to 15 U.S.C. § 15.

That RB Rubber be awarded its interest and costs of suit incurred in this action as authorized by law; and

That RB Rubber be awarded such other and further relief as the Court may deem just and proper.

## SECOND CLAIM FOR RELIEF

### (Declaratory Judgment of Unenforceability of '723 Patent)

84. RB Rubber repeats and realleges every allegation set forth above.

85. As a result of the enforcement activities described above, there exists a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

86. The claims of the '723 Patent are unenforceable based on fraud, inequitable conduct, and violation of the duty of disclosure by Dodge Representatives insofar as they withheld

Page 16 - Complaint

information material to the patentability during the prosecution of the '723 Patent application.

87.  The '723 Patent is unenforceable due to Dodge Representatives' material misrepresentations to the Patent Office with intent to deceive as more fully set forth above.

88.  A judicial declaration is necessary and appropriate so that RB Rubber may determine its rights regarding the '723 Patent.

89.  RB Rubber is entitled to a declaratory judgment that the claims of the '723 Patent are unenforceable due to inequitable conduct.

90.  This is an exceptional case and RB Rubber is entitled to attorneys' fees, both for past attorneys' fees incurred in connection with the Central District of Pennsylvania litigation brought by ECORE that Plaintiff was forced to defend as well as in connection with this matter, due to ECORE's inequitable conduct as provided for in 35 U.S.C. § 285.

WHEREFORE, RB Rubber prays for judgment in its favor and against Defendant ECORE as follows:

That the Court enter a judgment declaring that the '723 Patent was obtained fraudulently and through inequitable conduct before the United States Patent Office and that as a result, the '723 Patent is unenforceable; and

That this case be declared exceptional under 35 U.S.C. § 285 and that U.S. Rubber be awarded reasonable attorneys' fees and expenses incurred in connection with this matter as well as in connection with the Central District of Pennsylvania litigation brought by ECORE and that Plaintiff was forced to defend.

That RB Rubber be awarded such other and further relief as the Court may deem just and proper.

**Page 17 - Complaint**

## THIRD CLAIM FOR RELIEF

### (False Patent Marking)

91. RB Rubber repeats and realleges every allegation set forth above.

92. The purpose of this lawsuit is to act in the public interest to enforce the policy underlying the False Patent Marking Statute, 35 U.S.C. § 292. Pleading in the alternative, Plaintiff brings this claim for competitive injury and damages it has sustained as result of ECORE's false patent marking.

93. The Patent Marking Statute (35 U.S.C. § 287) and the False Patent Marking Statute (35 U.S.C. § 292) exist to insure that the public has accurate information on the existence of patent rights.

94. Due to the public's interest in the patent system, Congress has empowered "any person" to file a false marking action in Federal Court under 35 U.S.C. § 292, or request reexamination of any claim of an enforceable patent (35 U.S.C. § 302 (ex parte)) and 35 U.S.C. § 311 (inter partes)), whether or not the person acting is involved in a substantial controversy with the patentee, or has adverse legal interests to the patentee, or has sustained an injury in fact.

95. ECORE based upon information and belief, holds hundreds of various patents and monitors both their own patents and those of other companies through both in-house and outside counsel, and accordingly is a sophisticated company as it pertains to patents.

96. Independent Claims 1 and 8 of the '723 Patent recite a flooring substrate which claims, among other things, that "the thickness of the substrate being about 10 mm". During the prosecution of the'723 Patent, ECORE added this limitation by amendment after final rejection by the Patent Office in order to secure allowance of Claims 1 and 8. In doing so, ECORE

Page 18 - Complaint

explained that the 10 mm thickness was a distinguishing inventive feature of the patent over prior art cited by the examiner.

97. In the Pennsylvania RB Rubber action, the court issued a claim construction ruling limiting the "about 10 mm" language of Claims 1 and 8 of the '723 Patent to mean between 9 mm and 11 mm.

98. Despite the clear language of the patent claims and the claim construction ruling in the RB Rubber Action, as well as the fraudulent actions to obtain the '723 Patent in the first place, ECORE has falsely marked, and continues to mark, non-patented products, including the Regupol-QT and QTscu, with the '723 Patent it its commercial advertising and promotion.

99. ECORE has and continues to advertise and assert that its acoustic rubber underlayment products, including the Regupol-QT and QTscu, purportedly covered by the '723 Patent, have thicknesses of 2 mm, 5 mm, 12 mm, 10 mm, and 15 mm.

100. ECORE has marked its advertisements and products, including the Regupol-QT and QTscu, with the '723 Patent number despite the knowledge that the claims of the '723 Patent clearly do not cover 9-11 mm, and despite that the '723 Patent is invalid or unenforceable, and fraudulently procured.

101. ECORE has caused its products, including the Regupol-QT and QTscu, and the falsely marked advertisements to enter into interstate commerce.

102. ECORE has engaged in these actions for the purpose of deceiving the public.

103. ECORE did not have, and could not have had, a reasonable belief, and in fact knew that its rubber acoustical underlayment products marked with Patent '723 were not actually patented..

**Page 19 - Complaint**

104. As a result of ECORE's actions, i.e. false marking of its products coupled with the intended purpose of deceiving the public and its competitors, the public was deceived and RB Rubber sustained damages.

105. ECORE is liable to the United States and RB Rubber for false marking under 35 U.S.C. § 292(b).

106. RB Rubber is entitled to recover penalties, fines available under 35 U.S.C. § 292(b), including $500 per article per fine for all ECORE 9 mm to 11 mm acoustical rubber underlayment products marked with Patent '723, and any other relief available under law including but not limited to its actual damages.

107. The public interest requires ECORE be enjoined from further acts of false marking.

108. This is an exceptional case and RB Rubber is entitled to attorneys' fees, both for past attorneys' fees incurred in connection with the Central District of Pennsylvania litigation brought by ECORE that Plaintiff was forced to defend as well as in connection with this matter, due to ECORE's inequitable conduct as provided for in 35 U.S.C. § 285.

WHEREFORE, RB Rubber prays for judgment in its favor and against Defendant ECORE as follows:

That the Court find that ECORE have violated 35 U.S.C. § 292 (b) by falsely marking and continuing to falsely mark its products with a notice that the products are covered by the '723 Patent;

An order fining ECORE for false marking of their products in an amount of up to $500 per article per fine in light of the total revenue and gross profit derived from the sale of falsely marked goods and the exceptional degree of intent, with half going to the United States and the

**Page 20 – Complaint**

other half going to RB Rubber;

An order preliminarily and permanently enjoining ECORE, its officers, agents, servants, employees, contractors, suppliers, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise, from committing new acts of false patent marking and to cease all existing acts of false patent marking within 90 days;

That this case be declared exceptional under 35 U.S.C. § 285, awarding to RB Rubber reasonable attorneys' fees and expenses incurred in connection with this matter as well as in connection with the Central District of Pennsylvania litigation brought by ECORE that Plaintiff was forced to defend; and

That RB Rubber be awarded such other and further relief as the Court may deem just and proper.

## FOURTH CLAIM FOR RELIEF

### (Violation of the Lanham Act §43(a), 15 U.S.C § 1125(a))

109. RB Rubber repeats and realleges every allegation set forth above.

110. ECORE's representations regarding its products in its marketing and advertisements in interstate commerce described above are clearly false and misleading statements of fact.

111. ECORE has marked its advertisements and products with the '723 Patent number despite the knowledge that the claims of the '723 Patent clearly do not cover 9-11 mm, and despite that the '723 Patent is invalid or unenforceable, and fraudulently procured.

112. ECORE has engaged in these actions for the purpose of deceiving the public.

113. ECORE has caused its products to enter into interstate commerce.

114. ECORE's misrepresentation was material in that it influenced purchasing decisions of the target audience, as demonstrated, in part, by the market power that ECORE was able to obtain in the Relevant Market.

115. As a result of these statements, a large segment of buyers or potential buyers of ECORE's rubber underlayment products have been deceived into believing that the above referenced ECORE products are covered by the '723 Patent.

116. Given ECORE's market power and the prevalence of ECORE's marketing efforts, it would be difficult and costly for RB Rubber to counter the false advertising.

117. As a result of ECORE's false advertisements, RB Rubber's attempts to compete in the market were hindered and delayed, resulting in damages, including but not limited to lost profit, loss of good will, and reputation.

118. RB Rubber is entitled to ECORE's profits resulting from the false advertising, damages sustained by RB Rubber, equitable remedies including injunctive relief, and the costs of the action and attorneys' fees.

WHEREFORE, RB Rubber prays for judgment in its favor and against Defendant ECORE as follows:

That RB Rubber be awarded damages in the form of damages and lost profits according to proof at trial;

That ECORE be enjoined from making or distributing further false advertisements;

That RB Rubber be awarded its interest, costs of suit and attorneys' fees incurred in this action as authorized by law; and

That RB Rubber be awarded such other and further relief as the Court may deem just and

**Page 22 - Complaint**

proper.

## FIFTH CLAIM FOR RELIEF

### (Violation of the Oregon Anti-trust law)

119. RB Rubber repeats and realleges every allegation set forth above.

120. ORS 646.725 provides that "every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce is declared to be illegal."

121. This Claim for Relief is brought pursuant to and authorized by ORS 646.780.

122. ECORE intentionally and fraudulently failed to disclose and concealed prior art from the Patent Office that was material to the '723 Patent application, as more fully set forth above.

123. ECORE also intentionally misrepresented to the Patent Office that Mr. Downey was the sole and first inventor of the invention claimed in the '723 Patent when ECORE, Mr. Downey, and Mr. Dodge knew that Mr. Downey was not and that the '723 Patent was invalid and/or unenforceable on that basis.

124. As described above, ECORE has been, and is currently engaged in, enforcing the fraudulently procured '723 Patent against its competitors, distributors, and others in the Relevant Market.

125. Had the Patent Office learned of the prior art, it would not have issued the '723 Patent.

126. ECORE's scheme to fraudulently induce the PTO into issuing the '723 Patent was specifically intended to support ECORE's attempt to monopolize the Relevant Market.

127. ECORE's scheme to enforce the fraudulently procured '723 Patent was specifically

**Page 23 - Complaint**

intended to support ECORE's attempt to monopolize the Relevant Market.

128.  As a result of ECORE's improper attempts to maintain and enlarge its market power through enforcement of the fraudulently procured '723 Patent, RB Rubber's attempts to compete in the market were hindered and delayed, resulting in damages including but not limited to lost profits, loss of good will, and reputation.

129.  The facts as set forth herein show that ECORE engaged in a conspiracy in restraint of trade or commerce in violation of ORS 646.725.

130.  RB Rubber is entitled to recovery of damages, injunctive relief, treble damages, as well as costs of this suit and attorneys' fees, according to ORS 646.770 and ORS 646.780.

WHEREFORE, RB Rubber prays for judgment in its favor and against Defendant ECORE as follows:

That RB Rubber be awarded damages in the form of injunctive and equitable relief, as well as other damages authorized by law, including damages, treble damages, and costs and attorneys' fees in connection with this case with this action against ECORE, pursuant to ORS 646.770 and ORS 646.780; and

That RB Rubber be awarded such other and further relief as the Court may deem just and proper.

### SIXTH CLAIM FOR RELIEF

### (Wrongful Initiation of Civil Proceedings)

131.  RB Rubber repeats and realleges every allegation set forth above.

132.  This Claim for Relief is authorized by ORS 31.230.

133.  ECORE initiated a civil action in January 2006 for infringement of the '723 Patent

**Page 24 – Complaint**

against RB Rubber in the United States District Court for the Middle District of Pennsylvania, Case No. 3:06-CV-0236 ("Pennsylvania RB Rubber action").

134.   When discovery in the Pennsylvania RB Rubber action revealed that ECORE intentionally failed to disclose material prior art, including prior art flooring systems that were offered and sold by ECORE's predecessor and its own joint venture partner, BSW, ECORE voluntarily dismissed the Pennsylvania RB Rubber action in November 2008.

135.   The Pennsylvania RB Rubber action ultimately came to a conclusion in the District Court on March 31, 2010 when the Court denied RB Rubber's Motion for Attorneys' Fees and Costs, and thereafter an appeal was subsequently dismissed.

136.   The intent to defraud or mislead the Patent Office is underscored by both the sheer volume of withheld references, as well as the source of the references.  The withheld references were either products produced by Dodge-Regupol, Inc. and/or Dodge-Regupol's joint venture partner BSW, as in the case of REGUPOL product and brochures, or was given to Dodge-Regupol, Inc. by BSW or third parties.

137.   As more fully set forth herein, ECORE lacked any probable cause to prosecute the RB Rubber Pennsylvania action as ECORE did not have, and could not have had, a reasonable belief, and in fact knew that its rubber acoustical underlayment products marked with Patent '723 were not actually patented..

138.   As more fully set forth herein, ECORE brought the RB Rubber Pennsylvania action maliciously and in bad faith as ECORE did not have, and could not have had, a reasonable belief, and in fact knew that its rubber acoustical underlayment products marked with Patent '723 were not actually patented.

Page 25 - Complaint

139. ECORE had motives or a primary purpose beyond that of merely securing an adjudication of the claim as it intended to monopolize the Relevant Market, as evidenced by not only the Pennsylvania RB Rubber action, but also the Primary Acoustics and by cease and desist letters to various other competitors and distributors, as set forth above.

140. RB Rubber has suffered damages in that it was forced to incur attorneys' fees, costs, and expenses to defend the Pennsylvania RB Rubber action

141. RB Rubber is entitled to punitive damages as ECORE's actions, as fully set forth herein, constitute intentional, outrageous, aggressive, and malicious wrongdoing.

WHEREFORE, RB Rubber prays for judgment in its favor and against Defendant ECORE as follows:

That RB Rubber be awarded damages in the form of compensatory damages, punitive damages, attorneys' fees, costs, and expenses both for defending the prior RB Rubber Pennsylvania action and for prosecuting this action; and

//

//

//

//

//

//

//

//

//

**Page 26 – Complaint**

That RB Rubber be awarded such other and further relief as the Court may deem just and proper.

DATED this 14th day of March, 2011.

Respectfully submitted,

ROSE SENDERS & BOVARNICK, LLP

Paul S. Bovarnick, OSB #79165
ROSE SENDERS & BOVARNICK, LLP
(503) 227-2486
Fax: (503) 226-3131
pbovarnick@rsblaw.net
　　　AND
HOLLAND, GROVES, SCHNELLER & STOLZE, LLC
Eric D. Holland
eholland@allfela.com
Steven J. Stolze
sstolze@allfela.com
R. Seth Crompton
scrompton@allfela.com
(314) 241-8111
Fax: (314) 241-5554
　　　(Pro Hac Vice pending)

Attorneys for Plaintiff RB Rubber Products, Inc.

**Page 27 - Complaint**